1
2
3
4
5
6           **UNITED STATES DISTRICT COURT**
7               **DISTRICT OF NEVADA**

8   BENSON PUMP CO., nka Mt. Rose          )      3:02-CV-0414-RAM
    Capital, Inc.,                         )
9                                          )
                Plaintiff,                 )      <u>**ORDER**</u>
10                                         )
        vs.                                )
11                                         )
                                           )
12  SOUTH CENTRAL POOL SUPPLY,             )
    INC., et al.,                          )
13                                         )
                Defendants.                )
14  _____ )
                                           )
15  SCP DISTRIBUTORS, LLC, fka South       )
    Central Pool Supply, Inc.,             )
16                                         )
                Counterclaimant,           )
17                                         )
        vs.                                )
18                                         )
                                           )
19  MT. ROSE CAPITAL, INC., fka Benson     )
    Pump Co.,                              )
20                                         )
                Counterdefendant.          )
21  _____ )

22          Before the court is Defendant SCP Distributors, LLC (hereinafter "SCP") Motion for Summary

23  Judgment filed on August 10, 2005.  (Doc. #73.)  Plaintiff Mt. Rose Capital. Inc. (hereinafter

24  "Benson") filed a combined opposition (Doc. #75) and cross motion for summary judgment on

25
26
27
28

1   November 28, 2005 (Doc. #76).[1]  SCP then filed a combined reply for their motion and opposition

2   to Benson's motion.  (Doc. #77.)  Benson did not file a reply to SCP's opposition.

3                                              **BACKGROUND**

4          Four agreements are at issue in this case.  The first two are in writing, the Asset Purchase

5   Agreement (hereinafter "APA") (Doc. #73, Exh. A) and the Escrow Agreement (Doc. #2, Exh. A,

6   Attach. 2).  They were entered into on the Closing Date of January 8, 1999, for the sale of Benson's

7   business and accompanying assets to SCP.  The third agreement (hereinafter "the side agreement")

8   was made orally (Doc. #75, Decl. Kopf, ¶ 3), either at the time of Closing or soon thereafter (Doc.

9   #73), and concerned the handling of the post-closing cash receipts.  The side agreement provided that

10  Benson would allow SCP's post-closing cash receipts to collect in its accounts.  (Docs. #73, 75, 77.)

11  The fourth agreement is embodied in a letter dated May 17, 1999 (hereinafter "the May 17th letter").

12  (Doc. #75, Exh. A.)  That letter was written by the Vice President of SCP, Mr. Cook, and signed and

13  returned by the CEO of Benson, Dr. Moon.  (*Id.*)  The letter proposed to settle the Base Purchase Price

14  for the buy/sell transaction that began with the APA and Escrow Agreement.  (*Id.*)

15         The Benson Group[2] filed a complaint (Doc. #2, Exh. A) in state court.  Benson has two claims

16  for relief.  (Doc. #2, Exh. A.)  The first is for breach of the May 17th letter.  (Doc. #75, Exh. A.)

17  Benson alleges this contract settled the purchase price disagreement between the parties.  The second

18  claim is for declaratory relief to determine the rights and obligations of Benson and SCP under the

19  APA, Escrow Agreement, May 17th letter, and the May 26th Joint Escrow Instructions.  (Doc. #2,

20  Exh. A.)

21         SCP removed the case to federal court based on diversity jurisdiction (Doc. #2).  28 U.S.C.

22  § 1332(c)(1) (2006).  Thereafter, SCP filed an answer and counterclaimed against Benson (Doc. #12),

23  which Benson answered.  (Doc. #31).  SCP has two counterclaims.  The first is a claim for breach of

24  ───────────────────

25  [1]Plaintiff's Opposition (Doc. #75) and Cross Motion for Summary Judgment (Doc. #76) are actually one
    document but were docketed separately.  For simplicity, the court will only make citations to Docket #75.

26  [2]"Benson" refers to three companies, including Benson Pump, Co., Benson Pump-Georgia, Inc., and

27  J.K.K.T. Corp.

28                                                      2

1    APA and its warranties for misrepresentation of the value of fixed assets bought by SCP.  (Doc. #12.)

2    The second claim is for the unfair trade practices and breach of a side agreement that alleges Benson

3    converted certain post-closing cash receipts that belong to SCP.  (*Id.*)

4                                    <u>STATEMENT OF FACTS</u>

5            This case involves a complicated series of transactions all in the course of Benson's sale of its

6    business and assets to SCP.  The APA and the Escrow Agreement set up the framework for the

7    transaction and the closing payment.  The parties agreed under the APA that the ultimate purchase

8    price would be determined at a later date after closing.

9            The closing payment was based on estimated numbers.  The ultimate purchase price was to be

10   equal to the "Base Purchase Price"[3] plus or minus the amount of any post-closing adjustments.  (Doc.

11   #73, Exh. A-1 (section 1.2(a)).)  Technically, "[a]t the Closing, an amount (the '<u>Closing Payment</u>')

12   equal to the Estimated Base Purchase Price (as defined in Section 1.4(a) . . . ) <u>minus</u> (I) $200,000 (the

13   '<u>Accounts Receivable Holdback</u>') and (ii) $500,000 (together with earnings thereon, the '<u>Base</u>

14   <u>Purchase Price Escrow Amount</u>') [would] be paid by [SCP] . . . to . . . [Benson]."  (Doc. #73, Exh. A-

15   1 (section 1.2(b)).)  Then, "after the Base Purchase Price [was] finally determined pursuant to Section

16   1.4 [after closing] . . . , [i]n the event that the Base Purchase price [was] greater than then Estimated

17   Base Purchase Price, [SCP] [would] pay to [Benson] . . . an amount equal to such excess [and vice

18   versa]."  (*Id.* (section 1.2(c)).)

19           The parties were unable to agree upon the Base Purchase Price after closing, including the

20   value of assets bought and sold, and the Accounts Receivable Adjustment amount and the post-closing

21   cash receipts.  (Doc. #77, Exh. I.)

22   A.  SCP's Counterclaim under the APA & the Schedule of Assets

23           SCP bases its first counterclaim for breach of contract and breach of warranty under APA

24   sections 4.5 and 4.25.  (Doc. #12.)  Section 4.5 of the APA said Benson's financial statements were

---

25           [3]The "base purchase price" was equal to "$2.5 million plus the sum of: (A) the Accounts Receivable

26   Price, (B) the Whole Goods Inventory Price, (C) the Parts Inventory Price, (D) the Fixed Assets Price and (E)

27   the Other Asserts Price . . . ."  (Doc. #73, Exh. A (section 1.3(a)).)

28                                              3

1   "accurate and complete, . . . consistent with [Benson's] books and records . . . , present[] fairly

2   [Benson's] financial condition and results of operations as of the times and for the periods referred to

3   therein, and ha[ve] been prepared in accordance with GAAP [(generally accepted accounting

4   procedures)], consistently applied, subject to normal year-end adjustments."  (Doc. #73, Exh. A-1.)

5   Section 4.25 of the APA warranted that none of the APA's schedules and attachments contained "any

6   untrue statement of a material fact or omit a material fact necessary to make the statements contained

7   herein . . . ."  (*Id.*)  Finally, section 7.2(a) of the APA provided that Benson would indemnify SCP "in

8   respect of any loss, liability, demand, claim, action, cause of action, cost, [or] damage . . . as a result

9   of, in connection with, relating or incidental to or by virtue of: (I) the breach of any representation or

10  warranty . . . , or (ii) the breach of any covenant or agreement of [Benson's] contained in [the APA]."

11  (*Id.*)  The indemnification provision was contingent on SCP giving written notice to Benson within

12  three years of the closing date.[4]  (*Id.* (section 7.2(b)(i)(z).)

13         SCP claims that despite the warranties made, Benson's Schedule of Fixed Assets was not

14  calculated in accordance with GAAP among other things, which resulted in SCP paying for $233,278

15  in fixed assets that were of little to no value.  (Docs. #12, 73.)  Specifically, SCP claims the following

16  fixed assets were misrepresented: (1) a leasehold improvement balance on property that Benson

17  vacated five years earlier; (2) an undepreciated asset balance on capitalized roof repairs that were

18  fifteen years old; (3) balances on repairs to certain assets such as a Rockford, Illinois warehouse and

19  showroom that SCP did not buy from Benson; and (4) balances on certain assets that did not exist.

20  (Doc. #7, Exh. F-6.)   SCP allegedly provided written notice of the purported breach on January 17,

21  2000 (Doc. #73, Exh. F-4), and again on April 20, 2001 (Doc. #73, Exh. F-6), with the expectation

22  of indemnification pursuant to APA section 7.2.

23         Benson claims any issue regarding the value of fixed assets is moot because the matter was

24  resolved through SCP's May 17, 1999 letter.  (Doc. #75.)  That letter credits SCP with $28,000 for

25

26         [4]The three year written notice contingency applied to the warranties in sections 4.5 and 4.25.  (Doc. #73,

27  Exh. A-1 (section 7.2(b)(I)).)

28                                                          4

1   missing assets, among other things (Doc. #75, Exh. A), and according to Benson it settles much of the

2   parties' dispute concerning the APA and the Escrow Agreement (Doc. #75).

3   B.  Benson's Claim under the May 17th Letter

4           On January 8, 1999, the parties agreed in the Escrow Agreement that Benson would deposit

5   $500,000 into an escrow account with Michigan National Bank.  (Doc. #2, Exh. A, Attach. 2.)  This

6   amount was called the "Base Purchase Price Escrow Amount," and was to "be available to satisfy any

7   amounts owed by [Benson] to [SCP] as a result of the determination of the Base Purchase Price . . .

8   ." (Doc. #73, Exh. A-1 (section 1.2(b)).)  That amount, however, is still in escrow because SCP and

9   Benson are unable to agree upon the Base Purchase Price.

10          According to Benson, issues over the $500,000 in escrow were resolved in an alleged contract

11  executed on May 18, 1999.  On May 17, 1999, Mr. Cook of SCP sent a letter to Dr. Joon of Benson

12  concerning the parties' issues on the inventory and fixed assets.  (Doc. #75, Exh. A.)  The letter was

13  "intended to be a proposal for settling the purchase variance [excluding the accounts receivable

14  dispute] . . . ."  (*Id.*)  It went on to recite the parties' respective calculations and adjustments, and

15  concluded with a settlement proposal for Benson in the amount of $94,644 for the purchase variance

16  along with a release of the $500,000 in escrow to Benson.  (*Id.*)  The letter was signed by Mr. Cook on

17  May 17, 1999.  (*Id.*)  Dr. Moon "agreed and accepted" the proposal by signing the letter the following

18  day on May 18, 1999.  (*Id.*)  The letter was returned to SCP on May 19, 1999.  (Doc. #2, Exh. A.)

19          Mr. Cook and Dr. Moon executed Joint Escrow Instructions to Michigan National Bank on

20  May 26, 1999 pursuant to the May 17th letter.  (Doc. #75, Exh. B.)  The May 26th letter notified the

21  Bank of their joint authorization to release the escrow funds, including all interest accrued, to Benson.

22  (*Id.*)  However, on May 28, 1999, Mr. Cook again wrote to Dr. Joon, stating that there were still two

23  more issues that needed to be resolved before SCP would release the escrow funds.  (Doc. #75, Exh.

24  C.)  Mr. Cook sought to account for the post-closing cash receipts and the Alden Leeds Inventory, and

25  recalculated the distribution of the $500,000 in escrow.  (*Id.*)  Mr. Cook offered to release $344,664

26

27

28                                                          5

to Benson, and $155,336 to SCP.[5]  (*Id.*)  Then, on July 15, 1999, the president of SCP, Mr. Manuel Perez de la Mesa, wrote to Michigan National Bank objecting to the release of the escrow funds.  (Doc. #75, Exh. E.)

Benson claims the signing and returning of the May 17th letter created a legally binding contact, and seeks the court's enforcement thereof.  (Doc. #75.)  Indeed, Benson's position is that those agreements and the escrow account are issues independent from the post-closing cash receipts because they were not a part of the APA.  (*Id.*; *accord* Doc. #75, Exh. D.)  Benson claims it has been damaged in excess of $10,000 as a result of SCP's breach of the May 17th and 26th letters.  (Doc. #2, Exh. A.)

SCP admits the existence of the May 17th letter, but claims that Mr. Cook had no authority to release the escrow funds in the May17th letter and no authority to execute the May 26th Joint Escrow Instructions.  (Doc. #12.)  In the alternative, SCP claims that the execution of both letters was based on the understanding that Benson would remit the post-closing cash receipts that were deposited into Benson's accounts following the Closing Date, which belonged to SCP.  (*Id.*)  When Benson allegedly failed return those funds, SCP directed the Bank not to release the $500,000 in escrow.  (*Id.*)

C.  SCP's Counterclaim under the Side Agreement for Post-Closing Cash Deposits

For one reason or another, SCP was unable to establish banking accounts by the closing date of January 8, 1999 to handle incoming post-closing cash receipts.  (Docs. #73, 75.)  Thus, both parties agreed that post-closing cash receipts would continue to be deposited into Benson's accounts, but would be owned by SCP.  (Doc. #73, Exh. D, ¶ 8; Doc. #73, Exh. F. ¶¶ 6-7; Doc. #75, Decl. Kopf, ¶ 3.)  The present total of cash receipts collected since January 8, 1999 is approximately $432,461.  (Doc. #73, Exh. F. ¶ 8; Doc. #75.)  According to SCP, they have always agreed to a simultaneous release of the $500,000 in escrow to Benson, for their post-closing cash receipts.  (Doc. #77.)

---

[5]At that time, SCP asserted there was $250,129 in post-closing cash receipts in Benson's accounts that belonged to SCP.  (Doc. #73.)  He simply subtracted that amount from the $594,664 he proposed to pay in the May 26th letter.  (Doc. #75, Exh. C.)

SCP argues that Benson has deliberately withheld those funds and requests that the court order Benson to turn over those funds with interest and the attorneys' fees for their collection. (Doc. #73.) Although Benson admits that SCP is entitled to the post-closing cash deposits in their possession, they contest SCP's right to collect interest and the associated attorney's fees. (Doc. #75.)

### LEGAL STANDARD

A party may move for summary judgment under Federal Rule of Civil Procedure (hereinafter "FRCP") 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those which would affect the outcome of the case under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Whether there is no genuine issue on a material fact means that a rational fact-finder must not be able to find in favor of the nonmovant. *Id.*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In ruling on summary judgment, the court does not weigh the evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994).

Where the moving party bears the burden of proof at trial, the moving party must "establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). This must be shown through affidavits or some other form of admissible evidence. *Id.* Conversely, where the moving party does not bear the burden of proof at trial, he only has to show the court that there is no genuine issue of material fact, *Celotex Corp.*, 477 U.S. at 323, on at least one of the essential elements of the other party's claim, *Fontenot*, 780 F.2d at 1195. This may be accomplished by either producing affirmative evidence to negate a material fact in the opposition's case, or by pointing out the absence of a genuine issue on a material fact in the opposition's case. *Celotex Corp.*, 477 U.S. at 325. In either instance, if the moving party meets his initial burden of production, the nonmovant who bears the ultimate burden

7

1  at trial "must set forth specific facts showing that there is a genuine issue for trial[,]" Fed. R. Civ. P.

2  56(e), and may not rely on mere allegations.  *Anderson*, 477 U.S. at 248.

### DISCUSSION

A.  The Timeliness of Benson's Filings

As a preliminary matter, SCP objects to Benson's Opposition to their Motion for Summary Judgment, and to Benson's Cross-Motion for Summary Judgment based on the untimeliness of their filing.  By court order, all dispositive motions had to be filed by August 10, 2005.  Local Rule 7-2(b) limited the filing of oppositions to a fifteen day period thereafter.

Federal Rule of Civil Procedure 16(b) provides that scheduling order will not be modified unless there is good cause shown.  *See also Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) (stating that the good cause requirement centers on diligence).  The court emphasizes that "[a] scheduling order 'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.' . . . Disregard of the order would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier."  *Mammoth Recreations, Inc.*, 975 F.2d at 610 (quoting *Gestetner Corp. v. Case Equip. Co.*, 108 F.R.D 138, 141 (D. Me. 1985)).  It is therefore within each court's discretion to deny motions solely based on their untimeliness.  *E.g.*, *Dedge v. Kendrick*, 849 F.2d 1398, 1398 (11th Cir. 1988); *see id.*

Here, SCP filed their Motion for Summary Judgement by the August 10, 2005 deadline.  (Doc. #73.)  Benson did not file their Cross-Motion until months later, on November 28, 2005.  (Doc. #75.)  Benson did not provide any explanation for its untimely filing.  In addition, Benson's opposition to SCP's motion came well after the fifteen day limit imposed by Local Rule 7-2(b).  (*Id.*)  Again, no explanation was provided.

Although these circumstances would allow the court to strike Benson's motions, the court will consider them.  SCP and Benson's cross motions are dispositive, and the court finds its ability to control its own docket would not be substantially diminished in this instance.  Moreover, even though SCP raises the objection to the untimeliness of Benson's motions, neither SCP nor the court can

8

1   articulate any harm that would be suffered by SCP in the event the court did consider Benson's

2   motions.  As such, SCP's objection to Benson's opposition and cross-motion are denied.

3   B.  Motion to Reopen Discovery

4           Generally, discovery may be re-opened on a motion for summary judgment only when a "party

5   cannot for reasons stated present by affidavit facts essential to justify the party's opposition . . . ."  Fed.

6   R. Civ. P. 56(f).  In this case, Benson asks the court, in connection with their cross-motion, to reopen

7   discovery with respect to the fixed asset valuation and other matters in the May 17th letter.  (Doc.

8   #75.)  This request, however, must be denied.  Benson bears the burden to show why more time is

9   necessary, and why the previously allotted time was insufficient.  *See Conkle v. Jeong*, 73 F.3d 909, 914

10  (9th Cir. 1995); *see also* L.R. 6-1, 26-4.  No affidavits have been submitted, *Barona Group of Capitan*

11  *Grande Band of Mission Indians v. Amer. Mgmt. & Amusement, Inc.*, 824 F.2d 710, 716 (9th Cir. 1987)

12  ("[r]eferences in memoranda and declarations to a need for discovery do not qualify as motions under

13  Rule 56(f)"), and in any event, no such showing has been otherwise made.  There is no explanation

14  of what discovery has been completed, L.R. 26-4(a), and why that discovery was insufficient to address

15  the issues.  There is also no description or explanation of what more Benson could possibly discover.

16  L.R. 26-4(b).

17          The only reason proffered by Benson is that "SCP waited until the close of discovery to

18  announce that it would not honor the [May 17th letter] on the fixed-asset valuation dispute.  Benson

19  had no warning that this was still in dispute."  (Doc. #75.)  This claim is without merit.  SCP's first

20  counterclaim asserted that Benson misrepresented the value of fixed assets by more than $230,000.

21  (Doc. #12.)  SCP also challenged the fixed asset valuation much earlier in two separate letters on

22  January 17, 2000 (Doc. #73, Exh. F, Attach. 4) and April 20, 2001 (Doc. #73, Exh. F, Attach. 6),

23  and objected to the validity and enforceability of the May 17th letter in its answer to Benson's

24  complaint (Doc. #12).  Moreover, considering that Benson's main claim is for the enforcement of the

25  May 17th and 26th letters, it is unclear why Benson would require more time for discovery on a matter

26  that is purportedly covered by those letters (*see* Doc. #75), and which Benson had two years to

27  investigate.

28                                                    9

The court has already extended the discovery cut-off date more than several times. *See California Union Ins. Co. v. Amer. Diversified Sav. Bank,* 914 F.2d 1271, 1278 (9th Cir. 1990) (stating that courts may deny further discovery if in the past discovery was not pursued diligently); *see also Ashton-Tate Corp. v. Ross,* 916 F.2d 516, 520 (9th Cir. 1990) ("the process of evaluating a summary judgment motion would be flouted if requests for more time, [or] discovery, had to be considered [when] requested well after the deadline"). The initial cut-off date was set to April 30, 2004 at a status conference held on October 30, 2003. (Doc. #36.) Then, by a joint motion, the court continued all pretrial deadlines just ten days before the discovery cut-off date, on April 20, 2004, in hopes that this case would settle. (Docs. #45, 46.) After settlement discussions failed, the discovery cut-off date was then reset to May 2, 2005 by stipulation on November 4, 2004. (Doc. #59.) Then again the court granted another request for extension until July 11, 2005. (Docs. #68, 72.)

Because Benson failed to comply with Rule 56(f), *Mission Indians,* 824 F.2d at 716, by making a requisite showing, and no good reason is readily apparent to the court, *see Conkle,* 73 F.3d at 914, Benson's request to reopen discovery is denied.

C.  Cross-Motions for Summary Judgment

This case involves a complicated series of transactions that begins with the sale of a business under a written agreement called the APA. The dispute arises from the parties' inability to settle on the ultimate Base Purchase Price. To that extent, the parties attempted to settle the matter privately through a letter dated on May 17, 1999 (Doc. #75, Exh. A), and joint escrow instructions written on May 26, 1999 (Doc. #75, Exh. B). That settlement did not succeed, and SCP eventually revoked their authorization to release the $500,000 held in escrow. (Doc. #75, Exh. E.)

The May 17th letter, although not the main agreement, provides a logical starting point for the court's analysis of the issues because it purportedly settled the parties' disputes over the Base Purchase Price.

(1) The May 17th Letter

It is uncontested that the letter dated May 17, 1999, sent by Mr. Cook of SCP and signed and returned by Dr. Moon on May 19, 1999, is a valid contract. Benson's claims depend upon the validity

10

1  of the May 17th agreement.  (*See* Doc. #2, Exh. A.)  SCP admits the letter constitutes a valid

2  agreement.  (Doc. #12, ¶ 13 (admitting that Mr. Cook was authorized to send the May 17th letter);

3  Doc. #75, Exh. G (acknowledging that a settlement was reached); Doc. #75, Exh. M (admitting that

4  "Mr. Cook was authorized to enter into the agreement" embodied in the May 17th letter); Doc. #77

5  ("The Base Purchase Price Adjustment undeniably took place, and SCP agreed to it"); *but see* Doc.

6  #12, ¶ 21 (calling the May 17th letter "unauthorized").)

7  　　　　The preliminary issue before the court therefore concerns the applicable law to this agreement.[6]

8  To that extent, the APA unequivocally designates Illinois law to govern all matters concerning the

9  APA.  (Doc. #73, Exh. A (section 9.9).)  Under Nevada's choice of law principles, *Bassidji v. Goe*, 413

10  F.3d 928, 933 (9th Cir. 2005), that provision in the APA is valid because it does not offend any

11  Nevada public policies, and because Illinois is substantially related to this action, *Ferdie Sievers & Lake*

12  *Tahoe Land Co. v. Diversified Mortgage Investors*, 603 P.2d 270, 273 (Nev. 1979).  Illinois is Benson's

13  state of incorporation (Doc. #2, Exh. A), *see Nedlloyd Lines B.V. v. Superior Court*, 834 P.2d 1148,

14  1153 (Cal. 1992) (stating that a substantial relationship exists if one party is incorporated in the

15  chosen state), and the APA also covered the sale of certain assets located in Rockford, Illinois (Doc.

16  #73, Exh. A (section 1.7 & schedule 1.3(b)(iv)); Doc. #75, Exh. K (referencing the sale of purchase

17  of items in Rockford)), *see, e.g., Pentax Corp. v. Boyd*, 904 P.2d 1024, 1026 (Nev. 1995) (upholding the

18  validity of a Colorado choice of law clause where the plaintiff was headquartered and shipped the

19  merchandise in question from Colorado).  The parties even met in Chicago, Illinois for the closing of

20  the APA.  (Doc. #73, Exh. A (section 1.8(a)).)

21  　　　　The valid choice of law clause in the APA leads the court to conclude that the same choice

22  of law should be applied to the May 17th letter.[7]  *Gen. Signal Corp. v. MCI Telecomm. Corp.*, 66 F.3d

23

24  　　　　[6]This issue was not addressed in either party's motions.

25  　　　　[7]Although neither party has briefed the issue, the court finds there is also a question of whether Illinois

26  UCC should apply to this action.  Illinois courts use the predominant purpose test in viewing mixed transactions,
*Midwest Mfg. Holding, LLC v. Donnelly Corp.*, 975 F. Supp. 1061, 1067 (N.D. Ill. 1997), such as the APA (Doc.

27  #75, Exh. A (section 1.1)).

28

1500, 1506 (9th Cir. 1995).  SCP and Benson are sophisticated commercial entities; therefore, "the most reasonable interpretation of their actions is that they intended for the [APA choice of law] clause to apply to all causes if action arising from or related to their contract." *Nedlloyd Lines B.V.*, 834 P.2d at 1153; *accord Gen. Signal Corp.*, 66 F.3d at 1506.  Here, APA is the main agreement, and the May 17th letter at issue was clearly written with the APA and the Escrow Agreement in mind.  The express purpose of the May 17th letter was to come to a resolution on the purchase price variance.  Thus,

---

The APA was a mixed transaction in that it was an agreement for the sale of an entire business, which involved the sale of all the goodwill, leased real property, customer lists, creative materials, and permits and licenses belonging to Benson, in addition to the sale of fixed assets and inventory.  *See* 810 Ill. Comp. Stat. Ann. 5/2-105(1) (West 2005) (defining "goods" as "all things . . . which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid").  Here, the base purchase price was approximately $21 million.  (Doc. #77, Exh. I.)  The bulk of that amount appears to have been for Benson's tangible assets given the parties' definition of that amount (*see* Doc. #73, Exh. A (section 1.3) (defining the base purchase price as $2.5 million plus the sum of the accounts receivable price, the whole goods inventory price, the parts inventory price, the fixed assets price, and the other assets price); *see also* Doc. #77, Exh. I (stating that SCP paid less than $3 million for the accounts receivable)), and the parties' understanding of what was purchased (*see* Doc. #73, Exh. A (section 1.1(a)) (including intangibles such as good will, licenses, leased properties, creative materials, and customer lists)).  *E.g.*, *Monetti, S.P.A. v. Anchor Hocking Corp.*, 931 F.2d 1178, 1184 (7th Cir. 1991).  Also, there is no indication that SCP was motivated to purchase Benson's business for its excellent name, intellectual property rights or licenses.  *See Midwest Mfg. Holding, LLC*, 975 F. Supp. at 1068 (stating that courts should look at the "important goal of the agreement" as opposed to mere numbers).  Based on these facts, the court finds the UCC should apply.  *E.g.*, *Fink v. DeClassis*, 745 F. Supp. 509, 515-56 (N.D. Ill. 1990) (comparing the relative prices paid for tangible and intangible assets).

Similarly, the UCC should also apply to the May 17th letter.  That letter was a continuation of the APA, in that the APA called for the determination of the ultimate purchase price to be made after the closing date.  (Doc. #73, Exh. A (section 1.4).)  An agreement, such as the one reached in the May 17th letter, was fully contemplated by both parties in the APA and Escrow Agreement to conclude the parties' transaction for the sale of Benson's business and assets.  *See, e.g.*, *Novamedix, Ltd. v. NDM Acquisition Corp.*, 166 F.3d 1177, 1183 (Fed. Cir. 1999) (concluding the UCC did not apply to a settlement agreement that provided for the delivery of certain inventory because its primary purpose was to settle patent infringement claims).  The fact that the transfer of title from Benson to SCP had occurred before the settlement was reached is not controlling.  *ITT Corp. v. LTX Corp.*, 926 F.2d 1258, 1267 (1st Cir. 1991).

12

1   because the letters are directly related to the APA and Escrow Agreement, the court finds they should

2   be governed by the same law.

3                          (I) Benson's Claim for Breach of Contract

4           The main issue before the court is whether SCP breached the agreement within the May 17th

5   letter.  *Henderson-Smith Assoc., Inc. v. Nahamani Family Serv. Ctr., Inc.*, 752 N.E.2d 33, 43 (Ill. App.

6   Ct. 2001) (listing the elements for breach of contract as "(1) the existence of a valid and enforceable

7   contract; (2) performance by the plaintiff; (3) breach of contact by the defendant; and (4) resultant

8   injury to the plaintiff").  Here, although Benson fulfilled their duties under the May 17th letter by

9   authorizing the release the of the escrow funds on May 26, 1999 (Doc. #75, Exh. B), *James v. Lifeline*

10  *Mobile Medics*, 792 N.E.2d 461, 464 (Ill. App. Ct. 2003) (stating that a party seeking the enforcement

11  of a contract must prove he complied with its terms), SCP attempts to justify their refusal to carry out

12  their part of the May 17th letter by explaining that they believed Benson was withholding their post-

13  closing cash receipts.  (Docs. #12, 77.)   Benson contends that since the parties' arrangement

14  concerning the receipts was separate from the May 17th letter, the APA, or the Escrow Agreement,

15  SCP could not lawfully halt their performance obligations under the May 17th letter.  (Doc. #75.)

16  The court agrees with Benson.

17          SCP's reasoning is not grounded in the agreement itself.  There is nothing in the May 17th

18  letter that discusses or contemplates the handling of the post-closing cash receipts.  *Abbott v. Amoco*

19  *Oil Co.*, 619 N.E.2d 789, 798 (Ill. App. Ct. 1993) (stating that "'courts may not add provisions to an

20  unambiguous contract even if these made the contract more equitable'").  It is clear that the letter only

21  covers variances for issues such as fixed assets and inventories.  It expressly provided that if those

22  calculations were approved by Benson, SCP would "then release the escrow . . . and instruct [their]

23  payables department to remit the $94,664 [variance in Benson's favor] promptly."  (*Id.*)  No other

24  contingencies are apparent in that letter, and there is no evidence of the parties' arrangement over the

25  post-closing cash receipts.  *Celotex Corp.*, 477 U.S. at 323-25.  Indeed, the May 17th letter was only

26  intended to settle the parties' dispute over the adjusted base purchase price under the APA.  (Doc.

27  #75, Exh. A; *see also* Doc. #73, Exh. A (section 1.2) (defining the Purchase Price without reference

28                                          13

1   to the post-closing cash receipts).) *Schwinder v. Austin Bank of Chicago*, 809 N.E.2d 180, (Ill. App. Ct.

2   2004) ("Great weight is to be given to the principal, apparent purpose and intention of the parties at

3   the time that they entered into the contract"). The parties' arrangement over the post-closing cash

4   receipts was a separate matter. (Doc. #73 (calling the arrangement a "separate agreement"); Doc.

5   #73, Exh. D, ¶ 5 (same); Doc. #73, Exh. F, ¶ 5 (same); Doc. #75, Decl. Kopf, ¶ 3 (same).)

6           Similarly, SCP cannot justify their refusal to perform under the May 17th letter under the APA.

7   SCP briefly agues that APA § 7.2(f) allowed them to setoff the amount of their post-closing cash

8   receipts from the $594,664 due to Benson. (Doc. #77.) However, SCP fails to show how that section

9   of the APA is applicable. *Roger Whitmore's Auto. Servs., Inc. v. Lake County*, 424 F.3d 659, 664 n.2 (7th

10  Cir. 2005) ("[i]t is the parties' duty to package, present, and support their arguments, and we shall not

11  waste our time searching in vain for a dispute of material fact if we come across a factual contention

12  or denial not adequately supported in the record by citation to admissible evidence"); *Forsberg v. Pac.*

13  *Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988) ("[t]he district judge is not required to

14  comb the record"). To invoke the setoff provision SCP must first prove that Benson "breach[ed] [a]

15  representation, warranty, covenant or agreement contained in [the APA]." (Doc. #73, Exh. A.)

16  Here, SCP claims that Benson failed to perform its post-closing obligations in good faith (Doc. #77),

17  which justified their refusal to perform under the May 17th letter. The implied covenant of good faith

18  and fair dealing provides, *see* 810 Ill. Comp. Stat. Ann. 5/1-203 (West 2005); *In re Estate of Erickson*,

19  841 N.E.2d 1104, 1108 (Ill. App. Ct. 2006), however, that "a party vested with discretion under the

20  contract may not exercise that discretion arbitrarily or capriciously." *Abbot v. Amoco Oil Co.*, 619

21  N.E.2d at 798; *accord Foster Enter., Inc. v. Germania Fed. Sav. & Loan Ass'.*, 421 N.E.2d 1375, 1380-81

22  (Ill. App. Ct. 1981); *accord Chrysler Credit Corp. v. Marino*, 63 F.3d 574, 579 (7th Cir. 1995). SCP

23  does not explain what discretion Benson may have had in returning the post-closing cash receipts.

24  *E.g., First Nat'l Bank of Cicero v. Sylvester*, 554 N.E.2d 1063, 1069 (Ill. App. Ct. 1990) (finding that a

25  bank had discretion in extending credit to customers). They also fail to show how Benson acted

26

27

28                                                    14

1   arbitrarily or capriciously in exercising that alleged discretion.  In fact, from all appearances, SCP takes

2   the position that Benson had absolutely no discretion in remitting the funds.[8]

3         In any event, the evidence shows that SCP did more than make their performance contingent

4   on Benson's repayment of the post-closing cash receipts.  As soon as May 28, 1999, SCP attempted to

5   resolve an issue related to the Alden Leeds inventory before releasing the escrow funds.  (Doc. #75,

6   Exh. C.)  Then, in another letter dated August 10, 1999, SCP conditioned their release of the escrow

7   funds on a settlement of invoice issues.  (Doc. #75, Exh. H ("[Mr. Perez] will authorize the release of

8   the escrow as soon as SCP receives a wire for $431,900").)  SCP, however, offers no argument or

9   evidence that would allow them to make their performance of the May 17th letter contingent on the

10   resolution of these additional issues.

11         The May 17th letter, clearly signed and agreed to by both parties, does not contemplate the

12   post-closing cash receipts.  SCP has not shown the court, factually or legally, that they were entitled

13

14         [8]Over and above that, "[i]t is axiomatic that before a court will consider a claim that the implied duty

15   of good faith has been violated, there must be some factual basis for . . . bad faith . . . ." 23 Williston on Contracts

16   § 63:22 (4th ed. 2005).  SCP claims that Benson did not "follow through on the post-closing obligation in good

17   faith . . . [when it failed to respond to Mr. Cook's letter] on May 28 [where he] request[ed] $250,129 in deposits

that had been identified thus far . . . ."  (Doc. #77 (referring to Doc. #75, Exh. C).)  However, there are no

18   grounds for the court to find Benson acted in bad faith given the lack of evidence to substantiate that amount.

19   The letter by itself does not prove that $250,129.20 was actually owed at that time in light of following

communications that changed the amount owed .  (*See, e.g.*, Doc. #75, Exhs. H, I.)  The documents that were

20   sent with the May 28, 1999 letter were not provided to the court.  (*See* Doc. #75, Exh. C).

21         Rather, the fluctuations both up and down in SCP's demands for the post-closing cash receipts indicate

22   that the parties may not have been able to accurately determine the proper amount due and that Benson did not

23   act in bad faith. (*See* Doc. #75 at n.3 (alleging that SCP's post-closing cash receipts were collected by Benson

only until January 27, 1999); Doc. #75, Kopf Decl. ¶¶ 3-5.)  For example, in another letter sent by SCP on

24   August 10, 1999, SCP claimed that the amount "[d]eposited in Benson [a]ccounts" that was "due [to] SCP" was

25   $227,916.  (Doc. #75, Exh. H.)  That amount is less than what they claimed was owed only two months earlier.

Then, on August 20, 1999, SCP wrote to Benson claiming that there was $432,461 in post-closing cash receipts

26   in Benson's accounts.  (Doc. #75, Exh. J.)  SCP's determination nearly doubled in ten days despite the fact that

27   Benson's collections stopped in January 1999.  (Doc. #75 at n.3.)

28

1   to hinge their performance of the May 17th letter on the resolution of other issues that were left out

2   of the letter. *Celotex Corp.*, 477 U.S. at 325. When SCP entered into the May 17th letter, SCP

3   became obligated to release the escrow funds and pay the $94,664 purchase price variance to Benson.

4   SCP breached the May 17th letter by failing to release the Escrow Amount to Benson,[9] refusing to pay

5   Benson the $94,664 purchase price variance settlement, and through its repeated attempts to change

6   the terms of that agreement.

7                        (ii) SCP's Counterclaim for Breach of Warranty

8           Summary judgment should be granted on Benson's breach of contract claim but for the second

9   issue concerning the May 17th letter. This second issue relates to the letter's scope, and whether it

10  forecloses SCP's first counterclaim for breach of warranty for alleged misrepresentations of fixed assets

11  in the APA. (Doc. #12.) SCP claims that $233,278 in fixed assets bought under the APA were

12  actually of little to no value, and that Benson must indemnify them under the APA section 7.2. (Doc.

13  #73.) Benson argues the issue is moot because the parties already settled the variance in the May 17th

14  letter with a credit of $28,000 for the missing fixed assets. (Doc. #75.)

15  _____

16  [9]In its Answer, SCP asserts that Mr. Cook had no authority to authorize the release of the escrow funds

17  on May 26, 1999, or that if he did, his release was contingent upon Benson's payment of the post-closing cash
    receipts. (Doc. #12.) However, SCP only argues the latter position in its Reply brief. (*See* Doc. #77.) There

18  is no argument concerning Mr. Cook's authority. They do not address how Mr. Cook lacked the actual or

19  apparent authority to release the escrow funds, despite the fact that he was SCP's signor on the APA (Doc. #73,
    Exh. A), the Escrow Agreement (Doc. #2, Exh. A, Attach 2), and the May 17th letter itself (Doc. #75, Exh.

20  A), *see Progress Printing Corp. v. Jane Byrne Political Comm.*, 601 N.E.2d 1055, 1066 (Ill. App. Ct. 1992)

21  (discussing actual and apparent authority), which obligated SCP to release the Escrow Amount.

22          In fact, this suit is the first time SCP raised questions over Mr. Cook's authority. When Mr. Perez notified

23  the escrow holder not to release the escrow funds, he only mentioned that the parties were having problems
    resolving money issues. (Doc. #75, Exh. E.) He did not object to Mr. Cook's authority to release the funds.

24  Also, when Dr. Moon wrote to Mr. Perez, stating that "[y]our signor to the escrow agreement, Mr. Dave Cook,

25  released the escrow in May according to the [May 17th] agreement[,]" (Doc. #75, Exh. F), Mr. Perez did not
    reply that Mr. Cook lacked the authority to do so (Doc. #75, Exh. G). Regardless of these facts, the court finds

26  the issue of Mr. Cook's authority is moot because SCP should have released the escrow funds, one way or another,

27  pursuant to the May 17th letter.

28                                                    16

First, the court finds summary judgment on SCP's claim for indemnification for the alleged misrepresentation of fixed assets and poor accounting must be denied. SCP does not have any evidence that Benson actually violated sections 4.5 or 4.25 of the APA other than its own self-serving letters. (*E.g.*, Doc. #73, Exh. F, Attachs. 4, 6.) Even so, the letters themselves, written by Mr. Perez to Dr. Moon, are merely unsupported allegations. They alone do not prove that Benson misrepresented the value of fixed assets, or failed to use GAAP in accounting for their finances. (*E.g.*, Doc. #73, Exh. F, Attach. 6 (merely listing "questionable fixed assets").) There are no calculations or underlying documents before the court, for example. *See, e.g.*, *Howard A. Koop & Assoc. v. KPK Corp.*, 457 N.E.2d 66 (Ill. All. Ct. 1983). There is no basis at all for the court to determine whether Benson's valuation of fixed assets were incorrect. 810 Ill. Comp. Stat. Ann. 5/2-607(4) (West 2005); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

Moreover, the court notes that SCP's Reply brief raises additional concerns. In the Reply brief, SCP stated:

> Benson argues that the issue [over the fixed asset valuation] is foreclosed by virtue of the "Base Purchase Price Adjustment" [*i.e.*, the May 17th letter] that was agreed upon by the parties. The Base Purchase Price Adjustment undeniably took place, and SCP agreed to it. But Benson fails to address the fact that the [APA] contains a separate provision, the "Representations and Warranties" provision in Sections 4.25 and 4.5, that is the basis for SCP's claim of misrepresentation.

(Doc. #77 at p. 7.) If both parties agree that the May 17th letter already compensated SCP for whatever miscalculations or financial misstatements that were made, the court fails to see what loss SCP has suffered within the meaning of APA section 7.2(a).

However, given the lack of evidence and clarity in SCP's position, the court finds that whether the May 17th letter did in fact settle SCP's claim regarding the fixed assets is still a genuine issue of material fact. The fact that the settlement agreement was reached on May 17, 1999, yet SCP's notice letters were sent on January 17, 2000 (Doc. #73, Exh. F., Attach. 4), and April 20, 2001 (Doc. #73, Exh. F, Attach. 6), indicates that SCP may have additional complaints that arose after the May 17th letter that were not covered by it. APA section 7.2 (b)(i)(z) did give SCP three years to pursue a claim

17

1   for indemnification pursuant to the warranties in sections 4.5 and 4.25.  Furthermore, SCP's notice

2   letters claim valuation misrepresentations totaling $233,277.87, which is nearly ten times greater than

3   the $28,000 credit in the May 17th letter.  The court should not grant summary judgment against

4   SCP's claim given these disparities in time and money.

5          More importantly, the May 17th letter fails to identify which assets the parties reached a

6   settlement on.  There is no way for the court to determine whether SCP's $5,917.70 claim for the new

7   dock at the Rockford warehouse (Doc. #73, Exh. F, Attach 6), for example, was included in the May

8   17th settlement.  The May 17th letter is not that specific, it only gives SCP $28,000 for "missing fixed

9   assets." (Doc. #75, Exh. A.)  This ambiguity in the term "missing fixed assets" in the May 17th letter

10   *Carney v. Paul Revere Life Ins. Co.*, 832 N.E.2d 257, 261-62 (Ill. App. Ct. 2005) (determining contract

11   ambiguity is a question of law), requires the consideration of extrinsic evidence in order to determine

12   what assets were covered by that letter, *William Blair & Co. v. FI Liquidation Corp.*, 830 N.E.2d 760,

13   769 (Ill. App. Ct. 2005).  The meaning of "missing fixed assets" term is a material question of fact that

14   prevents summary judgment in favor of either party in regards to the May 17th letter and the valuation

15   of certain fixed assets. *William Blair & Co.*, 830 N.E.2d at 769.

16          <u>(2) SCP's Counterclaim for Breach of the Side Agreement</u>

17          There is no genuine issue on any material fact that the parties entered into an oral side

18   agreement for the handling of SCP's post-closing cash receipts.  (Docs. #73, 75, 77; Doc. #75, Decl.

19   Kopf, ¶ 3.)  Benson concedes that SCP is entitled to summary judgment in the amount of $432,461

20   on the basis of an oral agreement.  *Amer. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir.

21   1988) (citing 10A Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 2723 (3d

22   ed. 1983)); *United States v. One Heckler-Koch Rifle*, 629 F.2d 1250, 1253 (7th Cir. 1980).  However,

23   Benson argues that SCP should not receive interest, fees or costs on that amount because the terms

24   of the parties' oral side agreement did not provide for them in the event of a dispute.  (Doc. #75, Decl.

25   Kopf, ¶ 3.)

26   ///

27   ///

28                                              18

1

(i) Attorney's Fees & Costs

2    SCP has two arguments for attorney's fees and costs that both rely upon a finding of conversion

3    under Illinois law.  They do not allege the oral side agreement provided for such fees in the event of

4    a dispute.  The court finds, however, that SCP is not entitled to attorney's fees for the recovery of the

5    post-closing cash receipts for four distinct reasons.  First, SCP's arguments for the award of fees both

6    arise under Illinois law (Doc. #73), yet SCP fails to prove that Illinois law even applies to its claim of

7    conversion under Nevada choice of law principles, *see Motenko v. MGM Dist., Inc.*, 921 P.2d 933, 934-

8    35 (Nev. 1996) (citing Restatement (Second) Conflict of Laws § 145(1) (1971)).  Second, assuming

9    that Illinois law applied, SCP's argument for fees and costs under Illinois' Uniform Deceptive Trade

10   Practices Act must fail because there is no predicate for the claim of fees and costs.  SCP has not

11   proved Benson has committed a deceptive trade practice.  *See* 815 Ill. Comp. Stat. Ann. 510/2 (West

12   2005).  Instead, SCP assumes without explanation that the burden of proof is on Benson to prove that

13   it has not done so.  (*See* Doc. #77.)

14   Third, and again assuming that Illinois law applied to SCP's claim of conversion, SCP reliance

15   upon a single Illinois case for the imposition of attorney's fees is misplaced. (Doc. #73.) SCP claims

16   that *Rauwolf v. Travelers Indem. Co.*, 313 N.E.2d 504, 505-06 (Ill. App. Ct. 1974), held that "a party

17   who shows that a conversion involved willful and wanton conduct, that is, 'a failure to exercise

18   ordinary care so gross that it shows a lack o[f] regard for the interests of others,' is also entitled to

19   payment of their attorneys' fees." (Doc. #73 at p. 17; *accord* Doc. #77 at p. 6.)  That quote, however,

20   was clearly lifted from the court's discussion on punitive damages.  *Rauwolf*, 313 N.E.2d at 505-06.

21   The *Raulwolf* court had discretionary authority to award costs by statute.  *Id.* at 506-07.  The fact that

22   the plaintiff had to show the defendant acted without regard for others was only incidental to his claim

23   for costs.  *See id.*

24   Fourth and last, the court finds that SCP is not entitled to attorney's fees and costs under

25   Illinois law because no conversion occurred.  In Illinois, the law of conversion for money is clearly

26   limited to those instances where the money is "capable of being described as a specific chattel . . . ."

27   *In re Thebus*, 483 N.E.2d 1258, 1260 (Ill. 1985); *accord Rasmussen v. Sports Media Sales, Inc.*, 691 F.

28

Supp. 153, 155 (N.D. Ill. 1988) ("[A]lthough it is not necessary for purposes of identification that money should be specifically earmarked"). For example, in *Eggert v. Weisz*, 839 F.2d 1261, 1262 (7th Cir. 1988), the defendant consignee sold the plaintiff consignor's stamp collection. The proceeds were kept in the defendant's general business account, they were not separately maintained, and were held for later payment. *Id.* at 1262. The plaintiff sued the defendant for conversion of funds when the defendant company dissolved without paying the plaintiff his sale proceeds. *Id.* at 1263. The Seventh Circuit held there was no conversion, *id.* at 1265, however, because the plaintiff could not identify the money owed. *Id.* at 1264. It was not a specific chattel. *Id.*

Similarly, in *Rasmussen v. Sports Media Sales, Inc.*, the plaintiff network and the defendant middle man orally agreed that the defendant would sell advertising time on the plaintiff's network. *Rasmussen*, 691 F. Supp. at 154. Under the agreement, the defendant received money from individual advertisers and remitted those funds to the plaintiff network after taking out its commission fees. *Id.* The parties never specifically agreed, however, that the defendant would keep the receipts separate from other funds. *Id.* Thus, when the plaintiff claimed the defendant converted a specific sum of money allegedly due, the court found no conversion occurred. *Id.* at 155. The court based its finding on the fact that the defendant "deposited the disputed funds in its general business account and was under no contractual duty to place the funds in a separate account segregated from all other funds." *Id.* (citing *Eggert*, 839 F.2d 1261 and *In re Thebus*, 483 N.E.2d 1258).

The facts of this case are strikingly similar to *Eggert* and *Rasmussen*. Here, there is no genuine issue that Benson and SCP agreed that since SCP did not have accounts ready to receive its post-closing cash receipts, Benson would collect them in its own accounts. (Docs. #73, 75, 77.) No party alleges that Benson had a duty to keep those funds separate from its own, or to collect SCP's receipts in a separate account. All the facts show that Benson used its preexisting business accounts to collect SCP's receipts. (*See, e.g.*, Doc. #73, Exh D., ¶¶ 7-8 (talking about the speed in which the closing occurred and how the receipts went "directly into Benson's bank account"); Doc. #75, Decl. Kopf, ¶ 3 (same); Doc. #75 at n.3 (stating that Benson had difficulty in determining how much money in its accounts belonged to SCP).) The law is clear, however, that the mere obligation to pay does not

1  automatically give rise to a claim for conversion of money. *Eggert*, 839 F.2d at 1264. Rather, the

2  intermingling of funds and the absence of a duty to segregate in this case prevent the court from

3  finding a conversion occurred under Illinois law. *Eggert*, 839 F.2d at 1264-65; *Rasmussen*, 691 F. Supp.

4  at 155.

5  (ii) Prejudgment Interest

6  Benson admits the parties had an oral agreement covering the handling of post-closing cash

7  receipts. (Doc. #75.) SCP is therefore entitled to a judgment in the amount of $432,461. SCP

8  claims, without providing any argument, that it should also receive prejudgment interest. Again, they

9  do not allege the oral side agreement provided for interest on the receipts. Benson takes the position

10  that interest is not due because the payment of interest was not a part of their oral agreement.

11  In Illinois,[10] prejudgment interest is only available by contract or statute. *Moody v. First Nat'l*

12  *Bank of Moline*, 608 N.E.2d 589, 591 (Ill. App. Ct. 1993). Although there is no argument or evidence

13  that the parties' oral side agreement contained a term for the payment of interest, the Illinois' Interest

14  Act, 815 Ill. Comp. Stat. Ann. 205/2 (West 2005), provides for the recovery of prejudgment interest

15  in cases where there is "a fixed an easily calculated amount due from a debtor-creditor relationship that

16  has come into existence by virtue of a written instrument." *Cress v. Recreation Servs., Inc.*, 795 N.E.2d

17  817, 859 (Ill. App. Ct. 2003). The lack of a writing, however, prevents the court from finding that

18  SCP is entitled to prejudgement interest at the rate of five per centrum per annum under the statute.

19  The Illinois Interest Act specifically requires a writing, be it a "bond bill, promissory note, or

20  other instrument of writing . . . ." 815 Ill. Comp. Stat. Ann. 205/2 (West. 2005). Because the basis

21

22  [10]Again, neither party addresses the applicable law to the parties' oral side agreement. Nevertheless, the

23  court finds that Illinois law should apply under Nevada's choice of law principles. *See Bassidji v. Goe*, 413 F.3d

24  928, 933 (9th Cir. 2005). SCP indicates the agreement was formed in Illinois, "on the closing date." (Doc. #73.)

25  Moreover, SCP and Benson are relatively sophisticated businesses and the oral side agreement was entered into

26  for the purpose of tying up the loose ends with the APA, which is governed by Illinois law. *Nedlloyd Lines B.V.*

27  *v. Superior Court*, 834 P.2d 1148, 1153 (Cal. 1992); *accord Gen. Signal Corp. v. MCI Telecommunications Corp.*,

66 F.3d 1500, 1506 (9th Cir. 1995). Thus, Illinois law governs the court's determination of prejudgement

interest. *Stonewall Ins. Co. v. Argonaut Ins. Co.*, 75 F. Supp. 2d 893, 912-13 (N.D. Ill. 1999).

28

for SCP's claim lies within an oral agreement, there is no "instrument of writing" to invoke the statute. *Kalalinick v. Knoll*, 422 N.E.2d 1011, 1018 (Ill. App. Ct. 1981) (refusing to award prejudgment interest based on an oral agreement).  Granted, there are several written letters from SCP which assert and evidence that Benson owes $432,461 for the post-closing cash receipts (*e.g.*, Doc. #75, Exhs. J, K, N), but they do not change the fact that Benson's liability derives from an oral agreement.  *Lazarra v. Howard A. Esser, Inc.*, 802 F.2d 260, 270 n.7 (7th Cir. 1986); *Lumbermen's Mut. Ins. Co. v. Slide Rule & Scale Eng'g Co.*, 177 F.2d 305, 311-12 (7th Cir. 1949); *Adams v. Amer. Int'l Group, Inc.*, 791 N.E.2d 26, 30 (Ill. App. Ct. 2003).  The letters themselves do not give rise to an obligation to pay.  *E.g.*, *Arthur Pierson & Co. v. Provini Veal Corp.*, 887 F.2d 837, 839-40 (7th Cir. 1989) (concluding that a written confirmation of an oral contract does not constitute a writing within the meaning of the Illinois Interest Act); *Emerich v. Leviton*, 454 N.E.2d 45, 48 (Ill. App. Ct. 1983) (determining that a real estate contract which provided for the payment of commission fees to the broker was sufficient under the Act even though the broker's employment arose from an oral agreement).

The Illinois Interest Act is inapplicable to the parties' oral side agreement.  SCP fails to provide the court with any legal authority to support the court's award of prejudgment interest, and there is no evidence that the parties agreed that interest would be paid.  Thus, SCP is entitled to summary judgment on its claim for breach of contract regarding the post-closing cash receipts only in the amount of $432,461.  Interest and attorney's fees and costs are denied.

///

///

///

///

///

///

///

///

///

22

<u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that Defendant SCP's Motion for Summary Judgment is **GRANTED IN PART** as to the $432,461 in post-closing cash receipts, and **DENIED IN PART** as to valuation of the fixed assets.  (Doc. #73.)

**IT IS FURTHER ORDERED** that Plaintiff Benson Pump's Cross-Motion for Summary Judgment is **DENIED** because there is a question of fact as to whether the May 17th letter covers SCP's counterclaim for the valuation of fixed assets.  (Doc. #75.)

DATED:  March 28, 2006.

_____
UNITED STATES MAGISTRATE JUDGE